UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-cv-00103-MOC

| | |
|---|---|
| STANLEY CORBETT, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| FRANK PERRY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** is before the Court on Motions for Summary Judgment filed by Defendants Gregory Haynes, M.D., (Doc. No. 119), and Sally J. Boss, Belquis Hopkins, R. David Mitchell, Frank Perry, Paula Smith, and Amba Totou, (Doc. No. 120).

## I. BACKGROUND

The *pro se* Plaintiff proceeding *in forma pauperis*, filed this action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly occurred while he was incarcerated at the Lanesboro Correctional Institution.[1] The Defendants are:[2] Frank Perry, the NCDPS secretary; R. David Mitchell, the Lanesboro CI administrator; Paula Smith, the director of health services for NCDPS; Gregory Haynes, a Lanesboro CI physician; and Belquis Hopkins, Amba Totou, and Sally J. Boss, Lanesboro CI nurses.

The Complaint passed initial review on Plaintiff's § 1983 claims of deliberate indifference to a serious medical need and supervisory liability, and the Court exercised supplemental

---

[1] Plaintiff is currently incarcerated at the Central Prison in Raleigh.

[2] The job titles reflect the Defendants' positions at the time of the incidents in this lawsuit. Defendants who have been dismissed from the lawsuit are not included in this Order.

1

jurisdiction over Plaintiff's negligence claim under North Carolina law.[3] (Doc. No. 9). The Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, costs, and any other relief that the Court deems just and equitable. (Doc. 1: Complaint at 34-35).

Defendants have now filed Motions for Summary Judgment. (Doc. Nos. 119-20: MSJs). The Court notified the Plaintiff of the opportunity to respond to Defendants' Motions and to present evidence in opposition pursuant to Fed. R. Civ. P. 56. (Doc. No. 124: Roseboro[4] Order). The Plaintiff failed to respond and the time to do so has expired. The matter is ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3.

---

[3] The case was assigned to Judge Frank D. Whitney at that time. The negligence claim relates to Defendants Perry, Smith, Mitchell and Hopkins' alleged failure to properly train and oversee medical staff. See (Doc. No. 1: Complaint at 32). The Plaintiff clarified on Defendant Haynes' Motion to Dismiss that he was not asserting a negligence claim against Dr. Haynes. See (Doc. No. 71: Plaintiff's MTD Response at 8).

[4] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. FACTUAL BACKGROUND

The parties' forecasts of evidence show the following, which is undisputed except as otherwise noted.

The Plaintiff, who has been incarcerated since 2003, broke out in hives in 2015 while he was housed at Warren CI. (Doc. No. 1: Complaint at 11-12); (Doc. No. 119-2: Plaintiff's Depo. at 1-2 (tr. 24, 28)). The Plaintiff was seen by UNC Dermatology on April 10, 2015. (Doc. No. 1: Complaint at 13). The Plaintiff was diagnosed with acute urticaria and acne; he was prescribed Allegra 180 mg twice per day for the urticaria, and clindamycin lotion and tretinoin cream for the

acne, with a plan to follow up.[5] (Doc. No. 1: Complaint at 13); (Doc. No. 119-3: Fowlkes Report at ¶ 3(a)-(f)).

Plaintiff was transferred to Lanesboro CI in mid-April 2015. (Doc. No. 1: Complaint at 11-12) (arrival at Lanesboro on April 19, 2015); (Doc. No. 119-3: Fowlkes Report at ¶ 6) (arrival at Lanesboro on April 16, 2015). The same day Plaintiff arrived at Lanesboro, he submitted a sick call request and declared a medical emergency for hives on his body, swollen legs and arms, and severe pain and itching. (Doc. No. 1 at 13). Also that day, Dr. Haynes and a nurse sent a Utilization Review ("UR") request that Plaintiff be referred to Charlotte Dermatology for a follow-up regarding his rash pursuant to the April 10 visit. (Doc. No. 119-3: Fowlkes Report at ¶ 6). UR requested more information for the Allegra that was requested by UNC dermatology because the requested dosage of 180 mg twice a day exceeded the FDA recommendation of 180 mg once a day. (Doc. No. 119-3: Fowlkes Report at ¶ 7).

On April 23, 2015, Plaintiff wrote a letter to Director Smith about his medical issues. (Doc. No. 1 at 13). On May 3, 2015, Plaintiff submitted a grievance regarding sick calls going unanswered, and numbness in his feet and legs from hives/swelling and bleeding from scratching his hives. (Doc. No. 1: Complaint at 18). That same day, Plaintiff saw a doctor who prescribed Benadryl and another medication (Doc. No. 1: Complaint at 13-14).

On May 7, 2015, Plaintiff wrote a letter to Administrator Mitchell about sick calls and grievances that were not being processed. (Doc. No. 1: Complaint at 18-19). On May 11, 2015, Plaintiff submitted a sick call request for hives, severe pain, and itching. (Doc. No. 1: Complaint

---

[5] According to the Plaintiff, he was supposed to receive a follow-up visit in five weeks if the medications did not help (Doc. No. 1: Complaint at 13), whereas Dr. Fowlkes's report indicates that the plan was to follow up in "about two months." (Doc. No. 119-3: Fowlkes Report at ¶ 3(f)).

4

at 19). Plaintiff also declared a medical emergency, which was denied by Nurse Vanscoten.[6] (Doc. No. 1: Complaint at 19). On May 14, 2015, UR approved Dr. Haynes' request for a follow-up dermatology appointment and the appointment at Charlotte Dermatology was scheduled for June 24, 2015. (Doc. No. 119-3: Fowlkes Report at ¶ 6). On May 15, 2015, Dr. Haynes saw the Plaintiff in response to the May 3 sick call request; he prescribed an oral steroid taper for three weeks and a five-day course of Benadryl four times per day. (Doc. No. 119-3: Fowlkes Report at ¶ 9). On May 16, 2015, Dr. Haynes requested approval for Allegra 180 mg once per day, rather than the twice-per-day dose that exceeded FDA recommendations, and the two acne medications. (Doc. No. 119-3: Fowlkes Report at ¶ 10); see also (Doc. No. 119-4: Thomas Report at ¶ 17) (Plaintiff's institutional providers, central office, and pharmacy discussed the efficacy of clindamycin lotion (which is non-formulary) versus clindamycin gel (which is formulary)). These medications were approved on May 18, 2015. (Doc. No. 119-4: Thomas Report at ¶ 17). The Plaintiff received the Allegra on May 21, 2015 and the acne medication on May 23, 2015. (Doc. No. 1: Complaint at 14, 20) (noting that Plaintiff received the medication once per day even though the UNC doctor recommended it twice per day).

Nurse Totou denied Plaintiff hive medication in the morning on May 22, 2015, and on May 27, 2015, stating that the Plaintiff did not get any medication for hives. (Doc. No. 1: Complaint at 19-20).

On May 31, 2015, Plaintiff submitted a sick call request for hives, itching, pain, bleeding, and numbness. (Doc. No. 1: Complaint at 20). Plaintiff sent a copies of the sick call request to Director Smith and Administrator Mitchell on June 1 and 6, 2015. (Doc. No. 1: Complaint at 20). Plaintiff declared a medical emergency for hives all over his body, pain, and itching on June 7,

---

[6] Vanscoten is no longer a Defendant in this case. See (Doc. No. 49: Order on MTD).

2015. (Doc. No. 1: Complaint at 20). Nurse Vanscoten provided Benadryl and calamine lotion that same day. (Doc. No. 1: Complaint at 20).

On June 10, 2015, Plaintiff was sent to the emergency room for a suicide attempt; it was noted that the Plaintiff had been very depressed because of a rash that he had for the past several months, however, no rash or skin lesions were noted on the physical examination. (Doc. No. 119-3: Fowles Report at ¶ 11); (Doc. No. 119-4: Thomas Report at ¶ 18).

On June 11, 2015, Nurse Bradley[7] denied Plaintiff's noon medications, saying he did not have any noon medications and Nurse Rushing[8] denied Plaintiff's evening and nighttime medications, saying that the Plaintiff did not get any medication for hives. (Doc. No. 1: Complaint at 21).

On June 24, 2015, Plaintiff visited Charlotte Dermatology. (Doc. No. 1: Complaint at 14, 16). The doctor recommended medication (dydroxyzine 25 mg by mouth every night for 30 days) and allergy testing for his chronic urticaria at Carolina Asthma & Allergy. (Doc. No. 119-3: Fowlkes Report at ¶ 12). Dr. Haynes reviewed and implemented these recommendations the same day by ordering the medication and placing a referral request for allergy testing. (Doc. No. 119-3: Fowlkes Report at ¶ 12).

On July 1, 2015, Nurse Patch denied Plaintiff's nighttime medication, saying he did not have any medication. (Doc. No. 1 at 21). Plaintiff had a sick call visit on July 14, 2015. According to the Defendants, the Plaintiff refused his appointment. (Doc. No. 119-3: Fowlkes Report at ¶ 13). According to the Plaintiff, Nurse Vanscoten denied his sick call and said that Plaintiff refused the

---

[7] Nurse Bradley was not named as a Defendant in this case.

[8] "Nurse Rushin" in the Complaint. This Defendant was dismissed from this action without prejudice pursuant to Federal Rule of Civil Procedure 4(m). (Doc. No. 102: Order on Rule 4(m)).

6

appointment. (Doc. No. 1: Complaint at 22).

Plaintiff was declared to be on a hunger strike on July 16, 2015. A nurse noted at that time that Plaintiff's skin was "normal." (Doc. No. 119-3: Fowlkes Report at ¶ 14). Plaintiff saw a physician in follow-up on July 22, 2015 and he was noted to no longer be on a hunger strike. (Doc. No. 119-3: Fowlkes Report at ¶ 15). Plaintiff complained of chronic shoulder pain, but not of urticaria or a rash; he was informed of his referral to an allergist. (Id.).

On July 27, 2015, UR responded to Dr. Haynes' request with a series of questions and requests for additional actions regarding the request for a referral to an allergy specialist. (Doc. No. 119-3: Fowlkes Report at ¶ 16). On August 3, 2015, Dr. Haynes saw the Plaintiff for his shoulder issue and prescribed medication for his skin issue. (Doc. No. 1: Complaint at 22); (Doc. No. 119-3: Fowlkes Report at ¶ 17).

Around August 15, 2015, Plaintiff declared a medical emergency due to an "allergic reaction;" he was evaluated by the nurse on duty and was provided Benadryl and hydrocortisone cream. (Doc. No. 119-33: Fowlkes Report at ¶ 18); (Doc. No. 1: Complaint at 22) (same allegations, but for August 16, 2015). Two days later, Dr. Haynes ordered radioallergosorbent testing ("RAST") for specific causes of the allergies. (Doc. No. 119-3: Fowlkes Report at ¶ 19); (Doc. No. 1: Complaint at 22).

On September 1, 2015, Plaintiff submitted a sick call for hives all over his body and requested to see an allergy clinic. (Doc. No. 1: Complaint at 22). He declared a medical emergency for hives on his legs on September 5, 2015 and Nurse Ratcliff provided Benadryl. (Doc. No. 1: Complaint at 22); (Doc. No. 119-3: Fowlkes Report at ¶ 20). Dr. Haynes saw the Plaintiff in clinic on September 7, 2015, informed Plaintiff that the RAST was positive for milk and peanuts, and ordered consultation with the dietician and for follow-up as needed. (Doc. No. 119-3: Fowlkes

7

Report at ¶ 21); (Doc. No. 1: Complaint at 23).

Plaintiff declared a medical emergency for hives on his body on September 9, 2015. According to the Plaintiff, Nurse Crump provided hydrocerin cream. (Doc. No. 1: Complaint at 23). According to the Defendants, the Plaintiff reported to the nurse that he had taken more than the recommended dose of Benadryl and did not have any left; the nurse provided hydrocortisone cream. (Doc. No. 119-3: Fowlkes Report at ¶ 22).

On September 24, 2015, Plaintiff submitted a sick call request and declared a medical emergency for hives on his arms and legs and swelling of the right leg/knee, and Nurse Perkins provided Benadryl. (Doc. No. 1: Complaint at 23). On September 28, 2015, the Plaintiff saw Dr. Haynes; he complained of right knee pain and itching around the knee and requested to be seen at the allergy clinic. (Doc. No. 1: Complaint at 23); (Doc. No. 119-3: Fowlkes Report at ¶ 23). Dr. Haynes prescribed additional cyproheptadine and another oral steroid taper, and ibuprofen for Plaintiff's knee pain. (Doc. No. 119-3: Fowlkes Report at ¶ 23).

On October 12, 2015, Dr. Haynes noted that the dietician recommended and ordered a bland special menu with no milk or peanuts for 12 months and other suggestions for the Plaintiff. (Doc. No. 119-3: Fowlkes Report at ¶ 24).

On October 21, 2015, Plaintiff declared a medical emergency because he "broke out with hives all over his body" but Nurse Boss "denied his request." (Doc. No. 1: Complaint at 23). Plaintiff declared another medical emergency on October 22, 2015 for the hives and Nurse Boss again denied his request. (Doc. No. 1 at 24).

On October 25, 2015, Plaintiff was evaluated by Carolina Allergy, which found no involvement in Plaintiff's "mouth, origin-pharynx, or pulmonary system in connection with his urticaria because there were only plaques in his extremities," and opined that Plaintiff is allergic

8

to milk and peanuts. (Doc. No. 119-4: Thomas Report at ¶ 12).

On November 2, 2015, the Plaintiff saw a nurse for hives and was provided Benadryl. (Doc. No. 119-3: Fowlkes Report at ¶ 25). The same day, the Plaintiff was placed on ammonium lactate topically, cetirizine (an antihistamine), diphenhydramine 25 mg 4 times per day as needed, hydrocortisone .1% 4 times per day, epinephrine .3% intramuscularly daily as needed, and Singulair 10mg daily; MAR indicates that he did not request the epinephrine and the others were administered, with the exception of Singulair which was pending delivery (Doc. 119-4: Thomas Report at ¶ 12). The Plaintiff staged another hunger strike on November 4, 2015. (Doc. No. 119-3: Fowlkes Report at § 25).

On November 9, 2015, the Plaintiff saw Dr. Southerland[9] about hives on his body, and she prescribed medication. (Doc. No. 1: Complaint at 24). The Plaintiff was seen by a nurse practitioner in his housing unit for hives on November 10, 2015. (Doc. No. 119-3: Fowlkes Report at ¶ 25).

On November 16, 2015, the Plaintiff was evaluated in the clinic after he overdosed on several medications and "swallowed some metal;" Dr. Haynes ordered medical observation for 24 hours, serial vital signs, and referral to mental health. Dr. Haynes evaluated Plaintiff that day. Plaintiff subsequently refused to have his vital sighs taken and stated he was on a hunger strike. (Doc. No. 119-3: Fowlkes Report at ¶ 26). On November 17, 2015, Plaintiff was still on a hunger strike and was treated by a nurse for rash/hives; Plaintiff refused hydrocortisone cream. (Doc. No. 119-3: Fowlkes Report at ¶ 26).

On November 18, 2015, Nurse Boss denied Plaintiff's evening and nighttime medications for hives, claiming he did not have any medication. (Doc. No. 1: Complaint at 24). The Plaintiff

---

[9] Dr. Southerland is not a Defendant in this case.

ended his hunger strike and returned to his housing unit on approximately November 19, 2015. (Doc. No. 119-3: Fowlkes Report at ¶ 26).

On November 20, 2015, the Plaintiff submitted a sick call request regarding a continuous outbreak of hives; he requested the medication prescribed by Dr. Southerland and to see the allergy clinic. (Doc. No. 1: Complaint at 24). That same day, the Plaintiff had a physical examination that described his skin as "normal." (Doc. 119-4: Thomas Report at ¶ 12).

On December 2, 2015, the Plaintiff declared a medical emergency for hives on his arms, legs, hands, etc., and swelling of right hand and wrist; Nurse Wilkinson[10] provided Benadryl. (Doc. No. 1 at 24). On December 3, 2015, Plaintiff was seen by a nurse for a rash and pruritus; the nurse noted Plaintiff was awaiting an appointment with an allergist; the nurse asked a nurse practitioner to review the encounter. (Doc. No. 119-3: Fowlkes Report at ¶ 27). On December 9, 2015, the Plaintiff refused to have his labs drawn for evaluation. (Doc. No. 119-3: Fowlkes Report at ¶ 28); (Doc. 119-4: Thomas Report at ¶ 20). On December 17, 2015, Zyrtec, cyprohepatin, antihistamines and a special diet using soy and no peanuts were ordered. (Doc. 119-4: Thomas Report at ¶ 21). On December 24, 2015, Plaintiff declared a hunger strike and was sent to the ER for evaluation. (Doc. 119-4: Thomas Report at ¶ 13).

On December 27, 2015, the Plaintiff submitted a sick call request regarding hives on the top and back of his head, and he requested to see the allergy clinic. (Doc. No. 1 at 25). On December 28, 2015, he declared a medical emergency regarding hives on the back of his head, pain and itching; Nurse Morgan[11] provided Benadryl. (Doc. No. 1 at 25). The Plaintiff was "upset because [the nurse] saw no rash." (Doc. No. 119-3: Fowlkes Report at ¶ 29).

---

[10] Nurse Wilkinson is not a Defendant in this case.

[11] Nurse Morgan is not a Defendant in this case.

10

On November 1, 2016, Plaintiff saw Dr. Southerland about hives and she prescribed steroids, Benadryl, and something else. (Doc. No. 1: Complaint at 25). Dr. Southerland looked in the computer and saw that the medication she had prescribed in November 2015 was never ordered. (Doc. No. 1: Complaint at 25).

On January 1, 2016, the Plaintiff spoke to Assistant Superintendent Beaver[12] about a grievance re inadequate medical treatment. (Doc. No.1: Complaint at 25). Beaver said medical was backlogged with 500 sick call requests. (Doc. No.1: Complaint at 25). On January 7, 2016, the Plaintiff's main complaint was shoulder pain; he did not mention of any other complaints (Doc. 119-4: Thomas Report at ¶ 22). The Plaintiff had sick call appointment on January 13, 2016. (Doc. No. 1: Complaint at 26). That same day, Nurse Totou denied Plaintiff's morning Benadryl and his noon medications. (Doc. No. 1 at 26).

On February 24, 2016, the Plaintiff submitted a sick call request for hives all over his body, and he requested to see allergy clinic. (Doc. No. 1 at 26). That same day, UR approved Dr. Haynes' request for the allergy specialist referral and an appointment was made. (Doc. No. 119-3: Fowlkes Report at ¶ 30). On March 4, 2016, the Plaintiff saw Dr. Collins at allergy clinic, who prescribed several medications for hives. (Doc. No. 1: Complaint at 26). That same day, a Lanesboro provider made a UR request to approve the two non-formulary medications which had been prescribed by the allergist. The UR approved one of the medications (Singulair), and changed the eye drop prescription to an alternative pursuant to the pharmacy's recommendation; the same provider ordered Flonase spray and Zyrtec for allergic rhinitis, and requested UR approval for Plaintiff to return to the allergist in two months for a follow-up, which was approved. (Doc. No. 119-3: Fowlkes Report at ¶ 31). A test to measure 24-hour urine histamine level was begun (Doc. No.

---

[12] Mr. Beaver is not a Defendant in this case.

119-3: Fowlkes Report at ¶ 31).

The Plaintiff was transferred to Alexander CI on March 29 or 30, 2016. (Doc. No. 119-3: Fowlkes Report at ¶ 32) (Doc. No. 1: Complaint at 26).

In May 2017, the Plaintiff obtained a library article regarding chronic urticaria and angioedema; at that time, the Plaintiff learned that such could affect his lungs, muscles, and gastrointestinal tract. (Doc. No. 1: Complaint at 29).

### IV. DISCUSSION

#### A. Deliberate Indifference to a Serious Medical Need

The Plaintiff alleges that: Defendants Perry, Mitchell, Smith and Haynes failed to provide him with medications and a follow-up examination as recommended by the UNC dermatologist; Mitchell, Haynes and Hopkins failed to timely schedule a follow-up appointment for Plaintiff to see the allergy clinic; Boss denied his requests for medical emergencies; Totou and Boss failed to provide him with daily medications; Mitchell and Hopkins failed to provide the medications that Dr. Southerland prescribed on November 9, 2015; and Haynes and Hopkins failed to inform Plaintiff that angioedema is associated with hives.

To state a claim for deliberate indifference to a serious medical need, a plaintiff must show that he had serious medical needs and that the defendant acted with deliberate indifference to those needs. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 210 (4th Cir. 2017) (citing Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241 (internal quotation marks omitted). To constitute deliberate indifference to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock

12

the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer v. Brennan, 511 U.S. 825, 825 (1994).

First, the Plaintiff has failed to forecast evidence that he had a sufficiently serious medical need. The Plaintiff contends that he had chronic hives and angioedema and that these conditions are serious medical needs. (Doc. No. 1: Complaint at 32). The Defendants admit that Plaintiff had urticaria, however, they have presented evidence that his urticaria was not serious. An expert report opines that, "because the urticaria was localized to plaques on Mr. Corbett's extremities, it was neither an emergent nor an extremely serious condition, nor was it likely to have long-term sequelae beyond the skin on his extremities." (Doc. No. 119-4: Thomas Report at ¶ 19). The Defendants admit that angioedema is a serious medical condition, however, the Plaintiff did not have angioedema. The Plaintiff stated in his deposition that he has never been diagnosed with angioedema, but rather, he self-diagnosed after receiving a library article discussing that condition in May 2017. (Doc. No. 199-2: Plaintiff's Depo. at 7 (tr. 90-92)). It is undisputed that no health care provider has ever told the Plaintiff that he has angioedema or that his lungs, muscles, or gastrointestinal tract have been affected by angioedema or urticaria. (Doc. No. 119-2: Plaintiff's Depo. at 7 (tr. 90-92)). The medical records indicate, to the contrary, that the Plaintiff did not have angioedema while he was at Lanesboro CI. (Doc. No. 119-3: Fowlkes Report at ¶ 7(a)) ("I do not see within the records I reviewed that Mr. Corbett had angioedema of the oropharynx, airway, or muscle membranes while he was at Lanesboro CI"); (Doc. No. 119-5: Med. Records at 1) (September 16, 2016 Carolina Asthma & Allergy Center Report finding "No angioedema/wheeze"). The forecast of the evidence demonstrates that the sole condition at issue while Plaintiff was at Lanesboro CI was urticaria, and that this condition was not a serious medical need.

13

Second, the Plaintiff has failed to forecast evidence that the Defendants had a sufficiently culpable state of mind.

The Plaintiff has failed to allege that Defendants Perry, Mitchell and Smith, who are all supervisors, had adequate personal involvement in his case to give rise to a deliberate indifference claim. The Defendants have submitted evidence, that the Plaintiff has failed to rebut, that Defendants Perry and Mitchell are non-medical correctional officials and administrators who were allowed only limited information regarding inmates' health pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), and who were not responsible for personally providing care to inmates, including medication and medical treatment. (Doc. No. 122-1: Hopkins Decl. at ¶¶ 9-10); (Doc. No. 122-3: Mitchell Decl. at ¶ 7); (Doc. No. 122-2: Smith Decl. at ¶ 15) (Perry is not a medical doctor and was not involved in the day-to-day provision of healthcare). In fact, NCDPS Policy and Procedures provide that clinical matters involving medical judgments are the sole province of licensed health care providers. (Doc. No. 122-3: Mitchell Decl. at ¶ 7). Defendant Smith, as the NCDPS Medical Director, had overarching responsibilities regarding the provision of health services for over 37,000 inmates. (Doc. No. 122-2: Smith Decl. at ¶ 12). She delegated the responsibility to respond to inquire into and respond to inmate complaints to her staff, who often forwarded the complaints to the facility to address. (Doc. No. 122-2: Smith Decl. at ¶ 14). The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that Defendants Perry, Mitchell, and Smith had any personal involvement in his care adequate to establish deliberate indifference to a serious medical need, and accordingly, they are entitled to summary judgment on this claim.

Each of the Plaintiff's specific allegations of deliberate indifference will be addressed in turn. First, the Plaintiff alleges that Defendants Perry, Mitchell, Smith and Haynes were

14

deliberately indifferent with regards to the medications and follow-up examination recommended by the UNC dermatologist. It is undisputed that the Plaintiff was seen at UNC Dermatology on April 10, 2015, Allegra[13] and a follow-up appointment were recommended, and the Plaintiff was transferred to Lanesboro CI about a week later. (Doc. No. 1: Complaint at 13); (Doc. No. 119-3: Fowlkes Report at ¶ 3(a)-(f)). The same day Plaintiff arrived at Lanesboro, Dr. Haynes and a nurse sent a UR request for a dermatology follow-up, and UR requested more information about the Allegra because the requested dosage was twice the FDA recommended limit. (Doc. No. 119-3: Fowlkes Report at ¶ 7). Pursuant to the UR Plan, "all specialty appointments and surgical procedures have to be recommended by a physician and approved by the Utilization Review Board. The Utilization Review Board also has to approve follow-up appointments with outside providers…." (Doc. No. 122-1: Hopkins Decl. at ¶ 25); (Doc. No. 122-4 at ¶ 19). UR approved Dr. Haynes' request for a follow-up dermatology appointment on May 14, 2015, and Dr. Haynes requested Allegra 180 once a day on May 16, 2015 at the UR's request. (Doc. No. 119-3: Fowlkes Report at ¶ 10). The Plaintiff received the Allegra on May 21, 2015, and he was seen at Charlotte Dermatology on June 24, 2015. (Doc. No. 1: Complaint at 14, 16); (Doc. No. 119-3: Fowlkes Report at ¶ 12). While the Allegra and dermatology requests were pending in UR, the Plaintiff saw a doctor and was prescribed Benadryl and another medication on May 3, and he saw Dr. Hanes and was prescribed Benadryl and a steroid taper on May 5. (Doc. No. 1: Complaint at 13-14, 19); (Doc. No. 119-3: Fowlkes Report at ¶ 9). The Plaintiff has not forecast any evidence that Defendants Perry, Mitchell, Smith or Haynes deliberately delayed or denied him the medications or a follow-up examination as recommended by the UNC dermatologist.

Next, the Plaintiff alleges that Defendant Boss was deliberately indifferent by denying his

---

[13] The acne medication will not be included in this discussion.

requests for medical emergencies on October 21 and 22, 2015. (Doc. No. 1: Complaint at 23-24). The Plaintiff alleges that he declared medical emergencies for "hives" on both of these occasions, and that Defendant Boss "denied his request." (Doc. No. 1: Complaint at 23-24). As previously discussed, the Plaintiff's hives were not a serious medical need. The Plaintiff fails to allege that any other circumstance, such as complaints of severe pain, that would have notified Defendant Boss that the Plaintiff's condition was sufficiently serious and required emergency treatment. See generally Krell v. Braightmeyer, 828 F. App'x 155, 159 (4th Cir. 2020) (failure to provide medical care for substantial pain can constitute deliberate indifference even if the withholding, delay, or interference with medical treatment did not result in a new or exacerbated injury). Accordingly, the Plaintiff has failed to demonstrate that a genuine dispute of material fact exists with regards to Defendant Boss's alleged deliberate indifference on those occasions.

The Plaintiff alleges that Defendants Totou and Boss were deliberately indifferent by failing to provide him with medication on several occasions. Specifically, he alleges that Defendant Totou denied him: "medication for hives" on May 22 and 27, stating that he did not have any medication; and his morning Benadryl and "noon medications" on January 13, 2016, (Doc. No. 1: Complaint at 19, 20, 26); and that Defendant Boss denied him his "evening & nighttime medication for hives" on November 18, 2015, stating that he did not have any medication (Doc. No. 1: Complaint at 24). Defendants have submitted evidence that registered nurses are not able to prescribe medication and that they administer medication and deliver care as directed by orders of physicians, physician extenders, and nurse practitioners. (Doc. No. 122-1: Hopkins Decl. at ¶ 24); (Doc. No. 122-4: Totou Decl. at ¶¶ 7, 18). Although it is undisputed that the Plaintiff experienced occasional lapses in receiving his medications, he has failed to forecast any evidence that the medications were required to treat sufficiently serious medical needs, as previously

16

discussed. Nor has he forecast any evidence that these incidents were due to Defendants Totou and Boss' deliberately indifferent state of mind.

The Plaintiff contends that Defendants Mitchell and Hopkins were deliberately indifferent by failing to provide the medications that Dr. Southerland prescribed on November 9, 2015. As previously discussed, Defendant Mitchell is a non-medical correctional employee without any medical training or authority, or any direct involvement in the Plaintiff's care. Defendant Hopkins asserts, and the Plaintiff has failed to rebut, that she was never the Plaintiff's treating nurse and did nothing to delay his treatment. (Doc. No. 122-1: Hopkins Decl. at ¶ 28). Further, aside from the Plaintiff's general allegation that Defendants Mitchell and Hopkins were deliberately indifferent, he has failed to make any specific allegations or forecast any evidence that Mitchell and Hopkins were involved with, or even knew about, the medication that Dr. Southerland prescribed on November 9, 2015, or that they interfered with or delayed his receipt of that medication in any way.

Finally, the Plaintiff alleges that Defendants Haynes and Hopkins were deliberately indifferent by failing to inform the Plaintiff that angioedema is associated with hives. The Defendants have submitted evidence that the Plaintiff did not have angioedema when he was incarcerated at Lanesboro CI, and that he has never been diagnosed with that condition. These Defendants' failure to inform the Plaintiff about a condition that he did not have cannot be deemed to be deliberately indifferent.

The Plaintiff has failed to demonstrate that a genuine dispute of material fact exists regarding the Defendants' alleged deliberate indifference to a serious medical need. Accordingly, the Defendants' Motions for Summary Judgment are granted on that ground.

    **B.    Supervisory Liability**

The Plaintiff alleges that Defendants Perry, Smith, Mitchell, and Hopkins failed to adequately train the medical staff who they supervise. (Doc. No. 1: Complaint at 32).

A supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

The Defendants have been granted summary judgment on Plaintiff's claims of deliberate indifference to a serious medical need. The Plaintiff's supervisory claims based on those violations, therefore, necessarily fail. Waybright v. Frederick Cnty., Md., 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages.") (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)).

Therefore, the Defendants' Motions for Summary Judgment will be granted summary judgment on Plaintiff's claim of supervisory liability.

### C. North Carolina Claims

Finally, the Plaintiff asserts a negligence claim under North Carolina law against Defendants Perry, Smith, Mitchell, and Hopkins for negligent training and supervision of the medical staff who they oversee. (Doc. No. 1: Complaint at 32).

Claims of negligent supervision and training are "grounded in active negligence by the employer." Nance v. Rowan-Salisbury Bd. of Ed., 336 F.Supp.3d 593, 597 (M.D.N.C. 2018) (quoting Davis v. Matroo, 2013 WL 5309662, at *5 (E.D.N.C. Sept., 19, 2013); Braswell v. Braswell, 330 N.C. 363, 410 S.E.2d 897 (1991). To establish a claim for negligent supervision or

training under North Carolina law, a plaintiff must prove:

> (1) the specific negligent act on which the action is founded ... [;] (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; [ ] (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' ...; and (4) that the injury complained of resulted from the incompetency proved.

Beard v. Town of Topsail Beach, 2021 WL 2638147, at *12 (E.D.N.C. June 25, 2021) (quoting Medlin v. Bass, 327 N.C. 587, 590–91 (1990)) (emphasis omitted). A plaintiff has the burden to prove that the employer knew or had reason to know of the employee's incompetency. Smith v. First Union Nat. Bank, 202 F.3d 234, 249–50 (4th Cir. 2000).

The Plaintiff has not forecast any evidence demonstrating inherent unfitness or specific acts of negligence by any Defendant that would have put the supervisory Defendants on notice of any incompetence. See Section (1), *supra*. Further, Defendants Hopkins, Perry, and Mitchell have submitted evidence, which the Plaintiff has failed to rebut, that that they do not supervise medical staff and are not responsible for training medical personnel. (Doc. No. 122-1: Hopkins Decl. at ¶ 9, 12 ,14, 19). Defendant Smith has submitted evidence, that the Plaintiff has failed to rebut, that the Policy and Procedure in NCDPS was adequate to provide healthcare to inmates within he community standard of care, and that she was unaware of any pervasive problems with the provision of healthcare that would have required the intervention of Defendants Perry or Mitchell. (Doc. No. 122-2: Smith Decl. at ¶ 17). Moreover, the Plaintiff has failed to forecast any evidence that these Defendants' alleged negligence injured him. The evidence demonstrates that the Plaintiff had hives before arriving at Lanesboro; the medical providers at Lanesboro repeatedly attempted to provide effective treatment; the cause of his hives remains unknown; and his hives persisted at other prisons – including active hives at the time of his deposition – despite continuing treatment including medication prescribed by outside dermatologist and allergists. (Doc. No. 119-

19

Case 3:18-cv-00103-MOC   Document 126   Filed 08/27/21   Page 19 of 20

3: Fowlkes Report at ¶ 2). Therefore, "it would not matter to his outcome whether he had gone to the specialists earlier or had received more or different treatment." (Doc. No. 119-3: Fowlkes Report at ¶ 3).

Accordingly, the Defendants are entitled to judgment as a matter of law on Plaintiff's North Carolina negligent supervision and training claim. See Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646, 661 (4th Cir. 2017) ("district courts may enter summary judgment *sua sponte* 'so long as the losing party was on notice that she had to come forward with all of her evidence.'") (quoting Celotex, 477 U.S. at 326); see also 28 U.S.C. § 1915(e)(2) (the court shall dismiss the case at any time if the court determines that … the action … is frivolous or malicious [or] fails to state a claim upon which relief can be granted….").

### IV. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' Motions for Summary Judgment.

**IT IS, THEREFORE, ORDERED** that:

1. The Defendants' Motions for Summary Judgment, (Doc. Nos. 119, 120), are **GRANTED,** and this action is **DISMISSED** with prejudice.
2. The Clerk is respectfully directed to terminate this action.

Signed: August 27, 2021

Max O. Cogburn Jr
United States District Judge